ESTATE OF ROBERT T. DRAZEN, DECEASED, VERA H. DRAZEN, EXECU-
TRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 5505–64. Filed April 6, 1967.

*Nathan A. Resnik,* for the petitioner.
*Charles M. Costenbader,* for the respondent.

ARUNDELL, *Judge:* Respondent determined a deficiency in estate
tax of $27,261.52.

The only remaining issue for decision is whether the respondent
erred in including in decedent's gross estate under section 2040, I.R.C.
1954, jointly owned property in the total amount of $32,262.34. Several
other issues were assigned but were either settled by stipulation or
abandoned. Effect will be given to this stipulation in a recomputation
to be made under Rule 50.

FINDINGS OF FACT

The stipulated facts are incorporated herein by reference.

Robert T. Drazen, hereinafter referred to as decedent, died testate
at the age of 49 on January 11, 1960, at which time he was a resident of
New Haven, Conn.

Under the provisions of decedent's last will and testament, his wife
Vera H. Drazen, hereinafter sometimes referred to as Vera, was
designated executrix, and said executrix qualified and was duly ap-
pointed as such by letters testamentary granted on March 10, 1960,
by the Surrogate's Court, New Haven, Conn.

1

The estate tax return for the estate of the decedent was filed by the executrix with the district director of internal revenue, Hartford, Conn., on October 11, 1961.

In Schedule E of the estate tax return the executrix reported as "Jointly Owned Property" of decedent and Vera, cash on deposit in four joint bank accounts at the time of decedent's death, payable to either or the survivor, amounts as follows:

| | |
|---|---:|
| The Tradesmens National Bank of New Haven | $16, 835. 72 |
| Federation Bank & Trust Company (New York) | 697. 25 |
| First Federal Savings & Loan Association of New Haven | 175. 12 |
| The New Haven Savings Bank (New Haven) | 14, 554. 25 |
| Total | 32, 262. 34 |

Immediately after this total amount on Schedule E appeared these two sentences: "Only one half was property of decedent. Vera H. Drazen worked in Pure Oil [sic] Refiners—so one half of above represents her earnings over the years."

The executrix included in decedent's gross estate only one-half of the total amount of $32,262.34. The respondent in his determination included the entire amount and in a statement attached to the deficiency notice explained his determination, as follows:

| | Return | Determined |
|---|---:|---:|
| (b) Jointly owned property items 1–4 inclusive | $16, 131. 17 | $32, 262. 34 |
| Addition to gross estate | 16, 131. 17 | |

The adjustment reflects the inclusion under Section 2040 of the Internal Revenue Code of all jointly owned property.

The decedent was a full-time executive and stockholder of Drazen Lumber Co. in New Haven, Conn., except for some indefinite time devoted to Oilpure Refiner Co., hereinafter mentioned. For the years 1957, 1958, and 1959 his annual salary from Drazen Lumber Co. amounted to $23,000, $13,000, and $20,000, respectively, and in prior years his salary approximated the same amounts. He deposited his salary in the joint checking account at the Tradesmens National Bank of New Haven, hereinafter referred to as Tradesmens. This account was used by the decedent and Vera for household purposes. Vera also had a separate checking account at Tradesmens. It was a small account which she used for convenience. Vera also had a separate savings account with the Connecticut Savings Bank of New Haven, hereinafter called Connecticut Savings. At the time of decedent's death, Vera's balance in Connecticut Savings was $1,579.24.

About 1950 or 1951 the decedent and Vera obtained a franchise to sell, both at retail and wholesale, in the States of New Jersey and New York some kind of an oil refiner used in automobiles, trucks,

and stationary equipment. The initial investment in this business was between $5,000 and $10,000. It was taken from the joint Tradesmens account. The business was conducted as a sole proprietorship in the husband's name as Oilpure Refiner Co. of New York, hereinafter referred to as Oilpure. The decedent consulted Vera before going into the business. It meant that the decedent and Vera would have to give up their evenings, Saturdays, Sundays, and holidays to work at the business. They employed salesmen who traveled and solicited orders. They kept a telephone in an office in New York with an answering service to record orders. Oilpure carried approximately $10,000 worth of inventory in a warehouse in New York. In addition to his full-time employment with the Drazen Lumber Co., the decedent helped the salesmen of Oilpure, held sales meetings, discussed different ways of selling the product, went to see the distributors with the salesmen, took care of any trouble that arose, and signed all the checks. Vera operated mainly from their residence, where she did all the office work, such as bookkeeping, billing, ordering, looking after the inventory, and payment of bills by preparing checks for her husband to sign. Either she or her husband, or both, would go to the New York office several times a week to take care of the business there.

Oilpure had a checking account with the Chase Manhattan Bank of New York, which was in the name of "Oilpure Refiner Co., of N.Y. c/o Robert T. Drazen." At the date of decedent's death, the balance in this account was $24,529.04.

The net worth of Oilpure at the date of decedent's death was $50,558.91, determined as follows:

| | |
|---|---:|
| Cash | $24,529.04 |
| Accounts receivable | 4,971.68 |
| Inventories | 17,893.88 |
| Buildings and other fixed assets | 5,997.98 |
| Accumulated depreciation | (2,424.56) |
| Total | 50,968.02 |
| Less accrued taxes | 409.11 |
| Net worth | 50,558.91 |

The cash, accounts receivable, and inventories were all reported in decedent's estate tax return under Schedule F as "Other Miscellaneous Property."

Neither the decedent nor Vera drew any salary from Oilpure.

The money collected from the business of Oilpure was used to pay debts of Oilpure, several trips taken by the decedent and Vera, and the personal expenses of the decedent and Vera.

The net profit (or loss) from the operation of Oilpure was reported in the joint individual income tax returns of the decedent and Vera.

These operations for the years 1957, 1958, 1959, and 11 days in 1960 were as follows:

| Year | Gross profit | Deductions | Net profit (or loss) |
| --- | --- | --- | --- |
| 1957 | $29, 488. 07 | $30, 114. 36 | ($626. 29) |
| 1958 | 24, 633. 50 | 25, 210. 60 | (577. 10) |
| 1959 | 20, 345. 79 | 17, 516. 70 | 2, 829. 09 |
| 1960 | 222. 17 | 577. 10 | (354. 93) |

No part of the $32,262.34 contained in the four joint bank accounts on the date of decedent's death represented any deposit of money or earnings from Oilpure.

On December 30, 1958, Vera received a check in the sum of $1,031.05 from the Mutual Benefit Life Insurance Co., which represented a payment of dividend accumulations on a policy of insurance on the life of Vera. This policy was numbered 3043001 and was taken out on January 26, 1947. Vera was the owner of the policy and the check was made payable to her individually. All the premiums on this policy were paid out of the Tradesmens joint bank account. Vera, as joint owner of this account, wrote many checks on this account. On January 5, 1959, Vera deposited this $1,031.05 in the New Haven Savings Bank (New Haven), hereinafter sometimes referred to as the New Haven savings account. This amount represented a part of the $14,-554.25 that was in the joint savings account on the date of the decedent's death.

The decedent and Vera had two sons who were born in 1938 and 1943, respectively.

The decedent gave Vera a household allowance of approximately $100 a week. If she needed more, she could have had more. The money so given to Vera usually came from the Tradesmens joint account. Vera would sometimes accumulate money from her household allowance and redeposit it in Tradesmens or deposit it in her own separate savings account in Connecticut Savings.

On September 1, 1959, and January 8, 1960, deposits were made in Tradesmens of $14,095.65 and $7,495.26, respectively. No part of these deposits came from Oilpure.

Vera's father, Morris Livingston, loaned the decedent $5,000 on July 2, 1959. The loan was deposited in the New Haven Savings account on October 22, 1959, and represented a part of the $14,554.25 that was in the account on the date of the decedent's death. The loan was deducted as a claim against the estate in Schedule K of decedent's estate tax return.

#### OPINION

The only question remaining is whether any part of the moneys contained in four joint bank accounts of decedent and his wife, in the total amount of $32,262.34, on the date of decedent's death should be

excluded from the decedent's gross estate. The applicable statute is section 2040, I.R.C. 1954;[1] and the applicable regulation is section 20.2040–1, Income Tax Regs.[2]

In Schedule E of the estate tax return it was claimed that only one-half of the jointly owned property of $32,262.34 "was property of decedent"; and that Vera worked in Oilpure "so one half of above represents her earnings over the years."

The question involved is a factual one. Under the statute the *entire* amount in a joint account is included in the gross estate of the one who dies first "except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth." Sec. 2040, *supra*.

Most of the evidence in this case was a deposition of Vera's testimony concerning the acquisition and operation of the business of Oilpure. Interesting as her testimony was, it failed to show that any part of the moneys of Oilpure ever reached any one of the four joint bank accounts here in question. Oilpure had its own bank account and, on the date of decedent's death, the balance in this account was $24,529.04. This balance was included in the decedent's gross estate under Schedule F as "Other Miscellaneous Property" and is not involved in this proceeding.

---

[1] SEC. 2040. JOINT INTERESTS.

The value of the gross estate shall include the value of all property * * * to the extent of the interest therein held as joint tenants by the decedent and any other person * * * or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, *except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth:* * * * [Emphasis supplied.].

[2] Sec. 20.2040–1 Joint interests.

(a) *In general.* A decedent's gross estate includes under section 2040 the value of property held jointly at the time of the decedent's death by the decedent and another person or persons with right of survivorship, as follows :

\* \* \* \* \* \* \*

(2) In all other cases, the entire value of the property is included except such part of the entire value as is attributable to the amount of the consideration in money or money's worth furnished by the other joint owner or owners. * * *

(b) *Meaning of "property held jointly".* Section 2040 specifically covers property held jointly by the decedent and any other person (or persons) * * * and a deposit of money, or a bond or other instrument, in the name of the decedent and any other person and payable to either or the survivor. The section applies to all classes of property, whether real or personal, and regardless of when the joint interests were created. Furthermore, it makes no difference that the survivor takes the entire interest in the property by right of survivorship and that no interest therein forms a part of the decedent's estate for purposes of administration. * * *

(c) *Examples.* The application of this section may be explained in the following examples in each of which it is assumed that the other joint owner or owners survived the decedent :

\* \* \* \* \* \* \*

(5) If the decedent, before the acquisition of the property by himself and the other joint owner, transferred to the latter for less than an adequate and full consideration in money or money's worth *other income-producing property, the income from which belonged to and became the other joint owner's entire contribution to the purchase price, then the value of the jointly held property less that portion attributable to the income which the other joint owner did furnish is included in the decedent's gross estate;* [Emphasis supplied.]

On September 1, 1959, and January 8, 1960, deposits were made in Tradesmens of $14,095.65 and $7,495.26, respectively. On direct examination Vera testified that she thought these amounts came from Oilpure but on cross-examination she admitted that she was mistaken and that she was then convinced that the said amounts did not come from Oilpure.

Vera also testified that, aside from the $1,031.05 hereinafter mentioned, the money that went into the four joint accounts in question came from her husband's salary which he deposited and "from money that I would put in occasionally." When asked "Where did you get money to put in?" she answered: "I saved it from my household allowance, gifts sometimes." No testimony was offered as to the amount of the alleged gifts, the nature of the gifts, or anything concerning them. Vera ended her testimony on direct examination as follows:

other than the check which you received from Mutual Benefit for the dividend accumulations, where did the rest of the money come from that went into these joint accounts which are listed under Schedule E?

A. Are you talking about the joint savings account?

Q. That's right.

A. Some of that money came from paid-up premiums from insurance policies.

Q. And the remainder of the money, where did it come from?

A. From money that I deposited, from money that my husband deposited.

Q. And did any part of that money come from Oilpure?

A. It might have. That I am not sure of.

Mr. RESNIK: I have no further questions.

After carefully considering Vera's testimony and the documentary evidence she submitted along with her testimony, we are unable to find that any part of the moneys of Oilpure ever reached any one of the four joint bank accounts here in question.

Regarding the $1,031.05 which Vera deposited in the New Haven savings account on January 5, 1959, and which was still in the account on the date of decedent's death, the respondent, in his brief, states:

Also, the deposit of the accumulated dividends and interest of $1,031.05 on Mrs. Drazen's life insurance policy (Exs. 7, 14) is not excluded from the gross estate because the premiums were paid from the joint checking account in which the decedent's salary was the primary source of deposits.

It is true that the premiums on policy No. 3043001 came from the Tradesmens joint bank account but, under example 5 of section 20.2040–1(c) of the regulations, the $1,031.05 "belonged to and became the other joint owner's entire contribution" and should be excluded from the decedent's gross estate. See *Estate of Ralph Owen Howard*, 9 T.C. 1192, 1202–1203. In that case a husband gave his wife some Coca-Cola stock. She received some dividends from this stock which she used to pay for one-half the cost of some U. S. savings bonds which she put in the joint names of herself and husband. Her husband died and the Commissioner included the entire value of the

bonds in his gross estate. In holding that the Commissioner erred, we said:

> We do not agree with respondent's contention that dividends received by Mrs. Howard on stock registered in her own name should be treated as property originating with Mr. Howard. After the 100 shares of International Coca-Cola stock were given to Mrs. Howard in 1935 by her husband and certificate for these shares was issued in her name, she became the absolute owner of the stock and the dividends which she thereafter received on this stock were her individual property, and when she deposited these dividends in the joint bank account it was her property which she deposited. Cf. *Estate of James E. Frizzell*, 9 T.C. 979. In no sense did these dividends which she deposited originate with her husband. They originated with the International Coca-Cola Corporation. * * * If the proceeds from the sale of this stock had been deposited in the joint bank account, that would be another matter. We have no such situation here. We decide against respondent on this point. We hold that Mrs. Howard contributed her one-half share of the purchase price of the United States savings bonds and, therefore, only one-half of their value should be included in decedent's gross estate.

In the instant case, the policy of insurance on Vera's life was her property as was the Coca-Cola stock the property of Mrs. Howard in *Estate of Ralph Owen Howard, supra.* The check for the dividend accumulations was Vera's property as were the dividends in the *Howard* case the property of Mrs. Howard. In no sense did these dividend accumulations originate with the decedent. They originated with the Mutual Benefit Life Insurance Co. She could have deposited the $1,031.05 in her own savings account or could have spent it in any way she pleased. The fact that she chose to deposit it in one of the joint savings accounts should not alter the origination of the fund. We hold that the $1,031.05 deposited in the New Haven savings account should be excluded from the decedent's gross estate. *Estate of Ralph Owen Howard, supra.* Cf. *Harvey* v. *United States*, 185 F. 2d 463 (C.A. 7, 1950). The remainder of the $32,262.34 should be included in decedent's gross estate.

*Decision will be entered under Rule 50.*